known as S.L.I.M.E. Number 1530196. Good morning, your honors. Good morning. My name is Allison Mills. I'm here on behalf of the appellant. You need to speak up, please. Allison Mills on behalf of the appellant. As you know, Mr. Berry filed two motions to suppress in the district court, and after they were denied, he entered a conditional plea of guilty. The plea is conditioned on the outcome of this appeal. The two motions to suppress address different issues. The first addresses the 73-day GPS surveillance of Mr. Berry without a warrant, and the second addresses the hour-long traffic stop of Mr. Berry that we contend exceeded its permissible scope. I would like to focus this morning on the first motion, which addresses the GPS surveillance. After all the briefing, the issue comes down to one question, and that is did this circuit's precedent specifically authorize the government to do what it did? And the answer is no. This case was without precedent. The government does not and cannot dispute that the duration of this GPS surveillance, 73 days, more than 10 weeks, far exceeds the scope of any other case before it. And the technology warrants mentioned, too. The record evidence in this case is that this GPS device was a state-of-the-art GPS device. It had Google map visibility, satellite view, bird's eye view, and continuous access to GPS location information. This was no radio transmitter beeper. We know today that the government could not do what it did without getting a warrant. United States v. Jones addressed that issue. The government's position here is that pre-Jones, the use of a GPS device was, quote, not a Fourth Amendment concern. In other words, the government could choose to monitor someone, anyone, for days, weeks, months, world without end, with no judicial oversight and no risk of recourse. That's the government's position. In fact, actually, the government's position is a little bit worse. Because in this case, never mind judicial oversight, there was no oversight at all. One DEA agent decided to use this device. He testified that he was the decider. The DEA's own manual would have required him to first get approval from the U.S. Attorney's Office. He didn't do that. He said he had an understanding with that office. But he admitted he never talked to the office about that either. So never mind a neutral judicial magistrate. There was no oversight at all. The government's position is that is okay because the Fourth Amendment is irrelevant pre-Jones. Now, that's the position. But to avoid suppression, the government has to point to circuit precedent that specifically authorized it to do what it did. So let's look at that precedent. The government has relied in this litigation on United States v. Michael. That's the 1981 opinion of this court en banc that addressed beepers. Even Michael assumed that the use of a beeper for this kind of surveillance, actually not this kind of surveillance, for a much, much shorter surveillance, was a search within the meaning of the Fourth Amendment. So the Fourth Amendment is not irrelevant under Michael. And even Michael required for a search reasonable suspicion. So it's not true that Michael supports the government's position. But Michael's not the last word. This court, Judge Jones sitting on the panel, addressed GPS devices in United States v. Hernandez. Now, in that case, you know, we're in the 2000s, so we actually have GPS devices. But the GPS device actually- Courts have a hard time keeping up with technology. The courts are usually 10, 15 years behind technology. That's the problem. Case law can't keep up with the latest technology. That's understood. I can't either. But at this time in United States v. Hernandez, the GPS device in question actually operated a lot like the old school Michael beeper. And the agents in that case only used it to monitor the suspect for a single trip. So this court in Hernandez said that under those circumstances, a very unsophisticated GPS device that operated like a beeper, that was used solely to monitor the suspect for a single trip, the use did not require a warrant because it fell within Michael's scope. But importantly for our purposes today, the court addressed the possibility that the use of a far more sophisticated GPS device for an extensive period of time, and I think the court was contemplating at that point about 28 days, would raise constitutional concerns and might very well require a warrant. Does the GPS violate people's rights or is it the fact that the agents monitor the GPS? It's a good question because there's a distinction between installation and use. I think that installing the GPS device is a trespass, as Justice Scalia has said. But actually the use, the collection of that information, is equally a search. Who said that this GPS was, quote, collecting information? Well, they've never denied that it collected information. Well, what do you mean collected information? Did it provide a map? In other words, the officer isn't sitting there watching a GPS monitor, right, for 73 days? That's correct. No. But the government's computer system is collecting the information and the data is there, and the Fourth Amendment is concerned with the search. For instance, if the government takes my personal diary and photocopies it and throws the photocopy in a lockbox and says, well, no one's ever going to look at it, I mean, that helps my feelings a little bit, but I'm still violated. Well, since you've got eight minutes left, are you going to get to the Andres case? I will. I'd like to say that, well, I'll address that very quickly. That case was decided under plain error review. It's also unpublished, and the facts are completely distinguishable. It did not involve this kind of 73-day warrantless surveillance. It's not unpublished. It's 703F3828. Oh, I apologize, Judge Jones. I'm very sorry. I don't think that it controls here. I think these facts are distinguishable. It was plain error review. And I don't think that they looked at this the way this court should look at this case, which is the way that I think Justice Alito would have looked at this case were it before him. And you can refer to Justice Alito's concurrence, which was joined by Ginsburg, Breyer, and Kagan in United States v. Jones. He says, we don't have to know whether to draw the line, but surely the line was crossed at 28 days, and if there's no exigency, you've got to get a warrant. Here we're at 73 days. I would just like to say, to return to Hernandez, this court concluded that opinion and said, we don't decide the issue of extensive surveillance today. That case is not before us. That's what Hernandez says. That's the concluding remarks. Now, what does that mean for us today? What that means is the issue was undecided, which means that no circuit precedent specifically authorized the government to do what it did, which means that the government is not entitled to the good faith exception as articulated in United States v. Davis. Now, a word about Davis. This case is not Davis. Yes, good faith based on, do you have to have a case in point to support good faith, or do you just have to have a reasonable belief? No, you have to have a case on point. I don't think that's right. Otherwise, why bother good faith? I mean, you've either violated or you haven't violated. Your Honor, this court, before United States v. Davis, this court required unequivocal circuit precedent. Under Curtis. In United States v. Davis, I'll talk about Davis a minute. In United States v. Davis, the officers conducted a search incident to arrest at a traffic stop, and applying Belton's bright line rule, they searched the automobile. Fast forward to Arizona v. Gantt, excuse me, Gantt v. Arizona, the United States Supreme Court modified Belton's bright line rule such that the officer's search was no longer constitutional. The question arose, do we throw out the evidence now? And the Supreme Court reasoned that under the facts of that case, where the officers had followed then binding precedent, quote, to the letter, quote, scrupulously, where they were, quote, in strict compliance with binding precedent, there was no deterrent value served by suppression. That's not what we have here. We do not have a bright line rule. The issue was undecided. Well, they'd have had qualified immunity if he had sued them, would they not? I think it's a different analysis. I don't. I mean, because the point of qualified immunity is was there clearly established law that I've always in my head thought that the good faith exception was a shield that was analogous to qualified immunity. I think there's a distinction. I think in qualified immunity you ask whether the constitutional right was clearly established. I think here you ask whether circuit precedent specifically authorized the government to do what it did, and that's from Davis. But the whole point about, I mean, that's sort of inconsistent with the Streiff case this year, isn't it? I'm not familiar, Your Honor. Well, that was the one where the officers searched the fellow in Utah, and I can't quote you the exact language of it right now, but they held that the evidence didn't need to be suppressed over a vigorous dissent because they were objectively reasonable. I will look at that. Well, I'm maybe leading you down a rabbit trail. I really do think that the analysis is as straightforward as I've set it out. But you agree there's no case on point that says they could not do this? I agree that there was no case that said you cannot do it, but there was no case that said you could. And I do think that it would be unreasonable to assume that that Beeper case or any Beeper case before authorized them to survey anyone with a Beeper or a sophisticated GPS device for 73 days with no exigent circumstance at all. But there were cases that said you could use the Beeper without a warrant? That's correct, if you had reasonable suspicion. But to return to the government's position, this was a Fourth Amendment concern. It's not true that the Fourth Amendment was relevant. Are there any cases dealing with the timeliness of the situation you hear? No. And this case, again, to get back to my point, is without precedent. This is an egregious case. There's no case like this. In Jones, the issue was 28 days. Excuse me. It's egregious only because of the length? Is that right? I think that the length is what the duration is what is egregious. Just trying to tie it down. Your Honors, we do have a second motion to suppress that we've addressed, I hope, thoroughly, and it's a very fact-intensive inquiry. I would be happy to rest on my briefs unless the panel has questions. Otherwise, I will save my time for rebuttal. Let me just ask on that. Your position is that it becomes, at some point, the probable cause or reasonable suspicion becomes stale because the search is too long? My position is that, first of all, that the totality of the circumstances did not justify the first sniff, the very first sniff. But I feel more strongly that after that first drug sniff and after they searched the entirety of the truck, the truck bed, the passenger compartments, the undercarriage, probable cause dissipated. And at the 45-minute mark, they could not bring the drug dog back out and do it again. That's my position. Thank you, Your Honors. Okay. Thank you. Okay, Ms. Copes. Good morning, Your Honors. Diane Copes on behalf of the government. And with me is Sharon Lieberman, who was the lead trial counsel in this case, and also Bill McSherry, who was on the trial team as well. May it please the Court, this case involves a GPS. And let me start with the statement that the case is egregious because of the duration. And I want to address the duration. During the time that the beeper was on, 52 days, from June 9th until his arrest, and a total of 73. But 52 of those days, the agents had T3 authorizations on probable cause to listen to the conversations of Mr. Berry and also to get the cell phone GPS location from that. And Agent Solek testified that they used that much more sophisticated cell phone data to track him on three instances where they monitored him going to Houston and coming back. And those are June 7th, June 11th, and 12th, and July 1st. And they had this full, sophisticated T3 authorization. And as to what supported that, I would direct the Court to two things, because these have a lot of background that you don't see in our brief. The first is the wiretap T3 requests for May 25th and also a second phone on July 12th. And you'll find all of the wiretap authorizations in the record at pages 174 to 528. And the reason they're important is, first off, they show, as of May 25th, all of the facts that supported probable cause for those T3s at that time. And second, they also show the whole extent of the investigation, starting with the CI who said that Mr. Berry had been selling heroin and then also that there were T3s in place, I believe five of them, with co-defendants that had Berry already recorded setting up a meeting on April 26th. So you can see all that, and I don't want to go through it. But for 70, you know, in detail, because my point is for 52 of the 73 days, they had the full T3 authorization. What happened at the end of it on July 31st was he dropped his phone. That was to listen to the telephone. He dropped his phone on July 31st. Right, but the T3 dealt with the phone, not with the GPS. Is that right? Yes, Your Honor. But, you know, it talks about the PIN registers and all of the other information that they had on him, which supports reasonable suspicion under Michael. But it also shows that they used both the GPS on the phone and the actual content of the calls to monitor much more precisely what he was doing and what he was saying. And you can see some of that at pages 2792 to 2842 of the record, which is some of the DEA sixes and the summaries of the calls that were made during that time. And they had a lot of phone calls. They had the GPS tracking him on the phone that was authorized by Judge Zaney to and from Houston on three trips. That's what they relied on. Agent Solek testified that during that time the GPS tracker was a backup in case the phones failed. They didn't during that time, his two phones. On July 31st, on the order of Mr. Echervis Bonilla's. Were they able to track him by the use of the T3? Yes. They had. So then why use information about the GPS in trial and abuse matters? They didn't, Your Honor, up until July 31st. July 31st is the day that Mr. Berry decided to cease using his cell phone to avoid detection. That's something that the drug dealers do a lot. Agent Solek testified about that. So there's 52 days where the agents went and they got T3 authorization on full probable cause on his two phones, 52 of the 73 days. The remaining 21 days is the only time when the tracker came into play. And that's after Mr. Berry dropped his phone. When it, quote, came into play, does that mean they did not use it or refer to it, or are you just saying it was superfluous during that period of time? Your Honor, I haven't found anything in the record that says there was any monitoring of the GPS tracker at all. Indeed, Agent Solek testified, four defendants brought the GPS motion. And so it was looked at much more broadly than with the sort of precision that we have here. And Agent Solek testified that as to three of them, it never came into play at all because they were saying, well, you need to suppress. And he's like, well, there's, we used the Title III on them and there was never a time when they were without the Title III coverage. So the only time that the tracker was useful to the agents, since the T3 phones didn't fail, was after Mr. Berry dropped his phone. And there was a three-week period that's really the only time at issue here, and that's between July 31st and August 20th when the arrest was made because the geofence alerted officers that Mr. Berry was on his way to Houston again, consistent with the pattern and identical to the pattern that they had seen in the prior three. The T3 observed and they used the T3 information to trigger physical surveillance. And after all three of those searches, there were trash, I mean, I'm sorry, all three of those trips that were authorized by the T3s. So they were fully authorized by Judge Zaney. And, again, you can see that in the authorizations and orders in the record. They had the three trips that were same MO. They physically observed him, you know, leaving, being in Houston, coming back, and trash pulls after he dropped, Mr. Berry physically dropped something in the trash or he drove up to the dumpster and Mr. Haynes dropped something in the trash. Those are the last two trips. Trash pulls right after that showed that he had heroin thrown away, heroin packaging that had heroin residue, and it was consistent with between a quarter and one-kilogram quantities of heroin. And the packaging, you can see it in the dash cam when he drops out the two-half kilos, was actually the very same, black electrical tape, vacuum sealed. So they have all of this. They don't need the trackers. So are you saying had the case gone to trial, the government maybe would have not used any evidence from the tracker because they didn't need it because they had the 52 days of the T3 and other information? They would not have needed it for the 52 days because they had so much other information. And you can see that. That doesn't give me. So suppression is irrelevant so the government can do surveillance? Oh, no, Your Honor. Even if they're not planning to offer the evidence or rely on it? But you clearly did rely on it. Oh, no, Your Honor. I wasn't meaning to say that. I was meaning to say that during the 52-day period, they had lots of other things that were much more precise to tell them what was happening. It was only after July 31st when they were seeking another T3 and they had to find the telephone and do the PIN registers, and that's in Agent Solek's testimony that they were seeking another T3 authorization on another phone that he picked up at the time that the geotracker went off. So they're working to get another T3. The geotracker goes off and tells them he's on his way to Houston. It was of a very limited use in this case. And, Your Honor, you asked whether you're looking at just is it the GPS itself that's a problem or is it did the agents monitor it? Well, here there was no monitoring. The testimony was that the only use of this GPS tracker was to set up and get alerts on geofences on Interstate 10 on the I-10 corridor from New Orleans to Houston and Laplace and Lake Charles. And that's all it did. It sent an alert to the software. And if the agents were monitoring the software, they would know that he's on his way to Houston by an email alert because he passed two points. You know, Laplace, which they said was more of a minor one, and then Lake Charles, they know he's on his way to Houston, and all they used that for, agents said, the only purpose of it was to trigger physical surveillance. So when that went off on the 20th and they knew he was on the way to Houston, they called Houston, and consistent with the prior three trips, two of which produced heroin residue directly linked to Mr. Berry, he tossed it in the trash can or he drove it to the trash can and Mr. Haynes tossed it in the trash can. They got it out. They get the heroin package. Well, let me ask you a question. So what are you building up to? What's your legal point here? My legal point, Your Honor, is that the agents acted both consistent with Michael and that this whole use question was more limited than is presented and also that the geotrackers were of a much more limited . . . So it's more like a beeper than some sort of real-time surveillance. Absolutely, Your Honor. In this case, two experts testified at the GPS hearing about the differences . . . Would there have been a problem? I mean, would there have been a problem had it been brought under preexisting Fifth Circuit law? I'm sorry. Had it been . . . Had it continuously tracked wherever he was going and they could log on and see where he was at any given point in time, would that have violated pre-Jones Fifth Circuit law? No, Your Honor, for two reasons. First, they had reasonable suspicion under Michael to place the tracker on June 9th underneath the car. It had already gone to Houston one time and been monitored through the precise . . . It's the 9-11 GPS technology on the phone and also through the conversations going back and forth showing that he was going there and he's coming back and he actually immediately thereafter sold drugs and they got the wrappings from a trash pull consistent with Mr. Berry. His co-defendant dumped it in the trash and they also found heroin packaging there. So at that point, they had a trip to Houston plus a CI tip, conversations recorded on various other co-defendants' T3s that started in March with Berry heard on them. I think we understand sort of the facts of what's the law here.  We are. There was an acknowledgment within the Fifth Circuit that GPS tracking, warrantless GPS tracking was okay, and that was based on Michael, right? Yes, Your Honor, and thank you for getting me there. I haven't had my coffee yet. The whole question in this case, again, as recognized by opposing counsel, is under Davis whether the agents acted in good faith reliance on circuit precedent at the time, and I would include the Supreme Court in that, and the answer is yes for two reasons. One is they acted consistent with Michael, and as the experts testified and Judge Malazzo credited, the GPS in this case could get the same information that the beeper in Michael could get. The old-fashioned beepers sent out signals through microwaves to towers where the agents would triangulate the information on a piece of paper with a pen, like we used to do, but they could still get real-time, as Judge Tate said, constant surveillance. So both based on the reasonable suspicion and the fact that this, the use of this, there wasn't any monitoring, as Your Honor pointed out. It just sent an alert if someone was watching the software that there was a, he's on his way to Houston. And the second point that my co-counsel just reminded me of is first we have Michael in 1981 saying reasonable suspicion, and they had it, and also in a public place they had that, and also on public roads, and Judge Malazzo talks about that. But the second thing they had, as recognized by this Court in Hernandez, was the Supreme Court's decisions in Knotts and Caro that beepers, and particularly Knotts was a vehicle beeper, and beepers in, beeper use was not a search under the Fourth Amendment. So there was Supreme Court authority post-Michael that use of a GPS not a search. And, Your Honors, I apologize. We cited Michael for that in our brief, but we also cited Hernandez, and Hernandez recognizes it actually came out in the middle of the monitoring, the T3 monitoring. Hernandez made clear that this 1981 and these 1983 and 1984 decisions of the Supreme Court were still alive and reliable as of the time that this was all going on, and so it said that the, it did say that the device was limited, but it said that it's not a search at all. And that's what the Supreme Court said in Knotts. Let me ask you, was the policy that the agents had to get approval from the U.S. Attorney's Office before they put on a tracker device? It was not, Your Honor. While there was something in the, there was a, the DA Mano stated it. It was not a policy. Judge Malazzo credited Agent Solek's testimony that he, it was his understanding that he did not have to get authorization, that at one point he had told legal counsel that he was doing the geo-tracking, not in particular Mr. Berry's instance, but generally, and counsel had not indicated there was any problem whatsoever with it. Also, the, in the record is the U.S. Attorney's statement that we did not require any sort of formal notification at the time, and the district court credited this. She heard Agent Solek's testimony, and she credited it. She credited it and found that there was no policy. So. Let me just ask you, I mean, you haven't mentioned the Andres case, which seems to be pretty clear cut, even assuming that a Fourth Amendment violation occurred and suppression would otherwise be appropriate. The evidence should not be suppressed in this case because the officers acted in reasonable reliance on circuit precedent. And then it cites Davis and Michael, and, you know, although it's in the context of plain error, it's pretty clear. And then the Tenth Circuit has absolutely agreed with that in a case called U.S. v. Mitchell, which came out just very recently, June 30th, 2016. Yes, Your Honor. I apologize for not mentioning both of those cases. They are very supportive. And the Andres case actually says there's no error at all. Right. And that no error part of Andres is what's applicable here. Okay. Well, we have your argument, I think. Thank you, Your Honor. Okay. Thank you. Your Honors, very quickly, I want to address three things. First, the timing here, because counsel talked about the wiretaps, the T3s. Those were not in existence at the time that Mr. Berry was arrested. The trash pulls she mentioned were in June. Mr. Berry was arrested in August. So I'd like to explain what happened. We had T3 wiretaps beginning on May 27th. They ended, as she stated, on July 31st. The GPS device was installed on June 9th, and it continued until August 20th, and they were relying on it exclusively on that day to follow Mr. Berry and pull him over and conduct the traffic stop that ultimately led to the discovery of the evidence that they would have used against him at trial and that we want to suppress here. So that's the timetable. They were relying solely on that GPS device at the time that they arrested Mr. Berry. Now, they mentioned Knott's. I'm very happy to address United States v. Knott's. They never once mentioned Knott's in their brief. They never mentioned it below. I went back and checked. Knott's is a beeper case. In that case, the government went to the vendor of some chemicals and said, Hey, we've got a suspect. Could we put a beeper in a box, and would you sell it to the suspect, and we'll use it to track him? That's what happened. The government tracked him to a cabin out in the woods. This case went up to the Supreme Court. The Supreme Court said, Under these circumstances, we don't see a Fourth Amendment violation. But the Supreme Court in Knott's expressly cautioned that we do not decide whether different constitutional principles would apply to a more sophisticated surveillance. They didn't even know about GPS devices at the time, but they could see that technology could be used differently. Now, Knott's does not decide this case, but you don't have to take my word for that. The United States Supreme Court in United States v. Jones said three separate times, Knott's does not decide the case before us. And Jones is a lot like this case, but our case is worse. And the Tenth Circuit says, Under these circumstances, and even assuming the officers in our case violated the Fourth Amendment by failing to obtain a warrant, we can attribute to them no more than simple negligence. Otherwise, we'd have to condemn them for conforming their behavior to the vision of four other — four rather than the voice of one circuit courts, because four circuits pre-Jones had held there was no search or that it was reasonable to attach the GPS tracker. Yes, Your Honor, and they cite this circuit's opinion in Hernandez. Correct. And I think that they misinterpret this court's opinion, because this court's opinion in Hernandez ends with the comment, We do not decide that case today. That's how Hernandez ends. I don't think that Hernandez supports the Tenth Circuit's position in their case or the government's position in this case. And to return to Knott's, again, this is the Supreme Court. This is Justice Scalia. Knott's noted, quote, unquote, unquote, Justice Sotomayor's concurrence, Knott's does not foreclose the conclusion that GPS monitoring in the absence of physical intrusion is a Fourth Amendment search. Knott's reserved the question whether different constitutional principles may be applicable to invasive law enforcement practices such as GPS tracking. Justice Alito, the beepers used in Knott's and Cairo merely emitted periodic signals that could be picked up by a radio receiver. Knott's did not specifically authorize the government to do what it did here. And one last note on Andres. It was plain error review, as we said several times, but it did not involve the duration of surveillance that we have here. This case, again, is simply without precedent. Thank you, Your Honors. Okay. Thank you.